IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v | ) CR. NO. 2:12cr87-WKW |
| | ) (WO) |
| RAJNEESH DIKKA DANIELS | ) |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. Introduction**

On August 9, 2012, the defendant, Rajneesh Dikka Daniels ("Daniels"), was charged in a superseding indictment with conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine base and cocaine powder in violation of 21 U.S.C. § 841(a)(1) and § 846. She was also charged with knowingly and intentionally using a communication facility, a cellular telephone, to cause and facilitate the conspiracy, in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2. (Doc. # 201).

On October 16, 2012, Daniels filed motion to suppress all evidence seized and all statements made during the search of her house at 62 James Drive, Millbrook, Alabama on May 10, 2012. (Doc. # 293). While it is difficult to discern the exact nature of Daniels' arguments, in her motion to suppress she challenges the validity of the search warrant arguing that the supporting affidavit did not establish probable cause. She also asserts that the evidence seized and statements made during and after the search of her apartment should be suppressed because her consent to search her apartment and her cellular telephone were not voluntarily given. Finally, Daniels contends that the officers did not advise her of her *Miranda* rights, and coerced her into giving consent and statements. Regarding her

statements, Daniels contends she was told that if she gave a statement, she would receive a favorable prison sentence. The court held an evidentiary hearing on the motion on December 10, 2012. Based on the evidence presented to the court and argument of the parties, the court concludes that the motion to suppress is due to be denied.

## II.  Facts

Prior to May 10, 2012, co-defendants Delmond Bledson ("Bledson") and Willie Jerome Davis ("Davis") were identified as targets of a drug trafficking conspiracy. As a result of the investigation into Bledson and Davis' activities, federal law enforcement officers secured nine (9) search warrants and twelve (12) arrest warrants to execute on various suspected members of the drug conspiracy. On May 10, 2012, one of the search warrants was executed at Daniels' apartment at 62 James Drive, in Millbrook, Alabama, in the Middle District of Alabama.

Between approximately 6:20 a.m. and 6:30 a.m., armed with a search warrant, three task force members knocked on the door of the apartment. Daniels answered the door. When Daniels answered the door, an entry team entered the apartment to secure it.

Once the entry team secured the apartment, Agent Billings and Agent Spivey entered the apartment. While it is undisputed that the agents were armed when they entered the apartment, at no time did they draw their weapons from their holsters. Daniels was not placed under arrest, and she was not restrained. Agent Spivey asked Daniels to sit on the couch, and advised her of her *Miranda*[1] rights. Daniels signed a rights form at 6:50 a.m.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

containing her *Miranda* rights and indicating that she understood she was waiving her rights.[2] Spivey then began interviewing Daniels. Billings testified that Spivey used a conversational tone with Daniels, and that Daniels was very cooperative.

Daniels was given a copy of the search warrant, and asked to give her consent to search the apartment, a piece of luggage[3] and her cellular telephone. Daniels gave written consent to conduct the searches as requested.[4] While other agents were searching the apartment, Daniels handed her cellular phone to Agent Spivey.[5] Spivey attempted to download call information from Daniels' phone, but his equipment malfunctioned. Spivey then asked Daniels for consent to take her phone to download call information, and Daniels agreed. Daniels sat on the sofa while the officers searched her apartment.

---

[2] In pertinent part, the waiver of rights on the form, reads as follows.

BEFORE WE ASK YOU ANY QUESTIONS, DO YOU UNDERSTAND:
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions.
You have the right to have a lawyer with you during the questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

The form also indicated that Daniels had read the form, she understood her rights, and that she "freely and voluntarily" agreed to answer questions.

(Evid. Hr'g Gov't Ex. A)

[3] After the canine officer alerted to the piece of luggage, Agent Spivey asked for specific consent to search the suitcase. Daniels consented and the luggage was searched. No contraband was found, and the luggage was not seized.

[4] Agent Billings testified that Daniels signed the consent to search the apartment form first, and then signed the consent to search the telephone form.

[5] Agent Billings testified without contradiction that Daniels handed her cellular telephone to Agent Spivey.

At no time during Daniels' conversation with Agent Spivey did Agent Billings hear Spivey mention anything about a possible prison sentence. At no time did the agents raise their voices to Daniels. Agent Billings denied that they threatened or forced Daniels in any way to consent to the searches, or to talk to Agent Spivey.[6] When the officers arrived to execute the search warrant, they were wearing clothing that identified them as law enforcement officers. The three member entry team was wearing bulletproof vests and helmets and carried assault rifles. It is undisputed that seven officers were present, but no more than four officers were present in the apartment at any one time.[7] However, at no time did any of the officers who were not part of the entry team draw their weapons. No officer made Daniels any promises, and no officer made any threats. At no time did Daniels ask for clarification of her rights.

The agents left between 9:30 a.m. and 10:00 a.m. They did not arrest Daniels, and the only items seized during the search were sets of scales and the cellular telephone that Daniels allowed the agents to take.

### III. Discussion

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

---

[6] During the evidentiary hearing, Agent Billings testified that he was approximately 6'1" tall and weighed 238 pounds. He testified that Agent Spivey was "a little bigger than him," and weighed between 240 and 245 pounds. The third agent present stood approximately 6 feet tall, and weighed about 245 pounds.

[7] Agent Billings testified that there were four agents in the entry team - three officers that entered the apartment and one officer that remained outside. He also testified that after the entry team secured the apartment, three agents including himself and Agent Spivey entered the apartment to conduct the search.

CONST. AMEND. IV.[8]  "The Amendment protects persons against unreasonable searches of "their persons [and] houses." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).  The Fourth Amendment further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Probable cause to support a search warrant exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).  Evidence seized as the result of an illegal search may not be used by the government in a subsequent criminal prosecution. *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002).

### A.  Search Warrant for 62 James Drive

In her motion to suppress, Daniels asserted that because the affidavit supporting the issuance of the search warrant relied on stale information, the search warrant did not establish probable cause.  However, at the evidentiary hearing, Daniels made no argument regarding the validity of the search warrant to establish probable cause.  Regardless of the validity of the warrant, the court concludes that *United States v. Leon*'s[9] good faith exception applies to the initial search of her apartment by the entry team.  The court further concludes

---

[8] Specifically, the Fourth Amendment provides that "[]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[9] *United States v. Leon*, 468 U.S. 897 (1984)

that Daniels' written consent renders the subsequent search permissible.

It is undisputed that when the agents arrived at 62 James Drive on the morning of May 10, 2012, they were armed with a search warrant issued by an United States Magistrate Judge.  The officers on the entry team knocked on the door of the apartment, and Daniels answered the door.  Relying on the search warrant, the team entered the apartment, conducted an initial search to secure the apartment and then left the apartment.  At this point, Agents Spivey and Billings entered the apartment.

For the reasons that follow, the court concludes that even if the affidavit in support of the search warrant failed to establish probable cause to permit the officers' entry into Daniels' apartment, the entry team's reliance on the warrant was not so objectively unreasonable as to warrant suppression of any evidence subsequently seized. *United States v. Leon*, 468 U.S. 897, 926 (1984).  In *Leon*, the Supreme Court recognized a good faith exception to the exclusionary rule for searches conducted pursuant to warrants.  Observing that the purpose of the exclusionary rule is to deter unlawful police conduct, the Court found that this purpose would not be served, and the rule should not be applied, when officers engage in "objectively reasonable law enforcement activity."  468 U.S. at 918-19.  In particular, the Court held that the suppression of evidence would have no deterrent effect "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920.  Under *Leon*, searches conducted pursuant to warrants will rarely require suppression; however, the *Leon* court did identify four situations in which suppression would still be appropriate. *Id.* at 923.  These situations

6

are: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in" *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Id.* at 923. (internal quotation marks omitted).

The first step for the court, therefore, is to determine if any of the four circumstances exist in this case. The defendant points to no evidence that the first *Leon* limitation, whether the magistrate judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth, is applicable. Next, nothing in this case suggests that the judge who issued the warrant abandoned her judicial role. Consequently, the first two grounds are inapplicable.

The remaining *Leon* limitations are whether the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable and whether the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. In *United States v. Martin*, *supra*, the court held that a reviewing court may look outside the four corners of an affidavit to determine whether

an officer acted in good faith when relying upon an invalid warrant. 297 F.3d at 1309. *See also United States v. Robinson*, 336 F.3d 1293 (11th Cir. 2003) (a court may look beyond the four corners of the affidavit, but is not required to in order to find good faith reliance). The court's approach to this question is instructive because of the court's description of the affidavit and its conclusions about it.

> [I]t is clear that the facts contained in the affidavit leave much to be desired. However, despite its deficiencies as to the specific dates and times and exact links to . . . [the defendant], we find that it was *not entirely unreasonable* for . . . [the officer] to believe that what he wrote in the affidavit would be sufficient to support a finding of probable cause.

*Martin*, 297 F.3d at 1315.

The question before the court is whether a reasonably well-trained officer would have known that the entry team's search was illegal despite the issuing judge's authorization. *United States v. Taxacher*, 902 F.2d 867 (11th Cir. 1990). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . . may be considered." *Leon*, 468 U.S. at 922 n. 23.

To determine whether the entry team's reliance on the warrant was reasonable, the court must determine whether the affidavit is merely a "bare-boned" affidavit containing only conclusory allegations; such an affidavit does not meet *Leon's* good faith exception. *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998). In determining whether the affidavit is "lacking in indicia of probable cause," the court must look to what is in the affidavit, not

what was left out of it. *See generally Leon*, *supra*. Thus, the fact that an officer could have put more information in the affidavit is not dispositive. Rather, the question is whether it was reasonable for the entry team to believe that what was included in the affidavit was sufficient to establish probable cause.

The court concludes that the affidavit constitutes more than just a "bare bones" allegation of wrongdoing.[10] The affidavit provides information concerning the identity of the alleged wrongdoer, the scope and extent of law enforcement's investigation, and the location of the place to be searched. It also contains extensive information about how drug traffickers customarily operate. Based on the totality of the circumstances, the court concludes that the entry team's reliance on the warrant was not so objectively unreasonable as to warrant exclusion of the fruits of the entry. *Leon*, 468 U.S. at 926.

Having concluded that the initial entry into the apartment did not violate the Fourth Amendment, the court now turns to the voluntariness of Daniels' consents and waiver of her *Miranda* rights.

### B. Voluntariness of Consent

During the hearing, Billings testified that Daniels gave consent to search her apartment and cellular telephone. A search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). *See also Vale v. Louisiana*, 399 U.S. 30, 35, (1970) (search authorized pursuant to consent is valid).

---

[10] Neither the defendant nor the government submitted the affidavit to the court. However, the court can, and does, take judicial notice of its own records. *See In re the matter of the search of 62 James Drive, Millbrook, Alabama*, 2:12mj101-SRW (M.D. Ala. June 12, 2012) (sealed)

"[W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991).

"The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) *quoting Schneckloth,* 412 U.S. at 231.

> We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, . . .

*Schneckloth*, 446 U.S. at 248-49. Thus, the proper inquiry is whether Daniels' consent was voluntary.

The government bears the burden of proof to show that the defendant's consent to search was voluntarily and freely given. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980). "[W]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth*, 446 U.S. at 222, *quoting Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

A consensual search is constitutional if it is voluntary, *i.e.* the product of an essentially free and unconstrained choice. *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir.

2001); *United States v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999); *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir. 1989) (citing *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961)).  In evaluating voluntariness, the court considers several factors, including the presence of coercive police procedures, the extent of the individual's cooperation with the officers, the individual's awareness of her right to refuse consent, the individual's education and intelligence, and the individual's belief that no incriminating evidence will be found. *Id.  See also United States v. Holmes*, 270 Fed. Appx. 767, 768 (11th Cir. 2008) (No. 07-12004)

In this case, the Government submitted Daniels' signed consent to search forms. (Evid. Hr'g Gov't Exs. B & C).  Daniels argues that her consent was coerced or not voluntary because the officers entered her apartment wearing bullet proof vests and carrying assault rifles.  She also argues that although she was not under arrest, she was required to sit on the couch, and she was not permitted to move around her apartment.  The fact that Daniels was in her own living room actually militates against coercion.  *See Garcia,* 890 F.2d at 361 ("We submit that one would feel more comfortable and free from pressure when he is in his own living room than when he is lying in the grass on the edge of the street.")

There is no evidence before the court that "these officers employed any tactics that would augment the degree of coercion that is inherent in any arrest." *Id.*, at 362.  And here, the undisputed evidence demonstrates that Daniels was not under arrest at the time she gave consent; she was not handcuffed or otherwise physically restrained.  There is no evidence that Daniels was harassed or intimidated by the officers, *id*., or that abusive language or

physical threats were leveled against her. *See United States v. Espinona-Orlando*, 704 F.2d 507, 513 (11th Cir. 1983).

During the evidentiary hearing, Billings testified that although members of the entry team were armed with rifles when they entered, once they secured the apartment, those officers left. Billings also testified that neither he nor Agent Spivey drew their weapons upon entering the house. Daniels does not assert, and there is no evidence to suggest, that any officer pointed a firearm at her. Any "show of force" about which Daniels now complains was at best minimal. *See United States v. Brown*, 223 Fed. Appx. 875, 880 (11th Cir. 2007). Although Daniels implies that she was "in custody," and the search was not voluntary, the evidence does not support her position. Daniels was not placed under arrest, handcuffed or otherwise physically restrained. There is no evidence, and Daniels offers none, of coercion.

Courts have found consent to be voluntary in factual scenarios more coercive than that described by Daniels. For example, in *United States v. Hidalgo*, consent was voluntary where the defendant was "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint." 7 F.3d 1566, 1571 (11th Cir. 1993). In *United States v. Garcia*, the consenting individual was arrested and handcuffed in the presence of fourteen law enforcement officers when consent was provided. 890 F.2d at 362. In each of these cases, consent was found to be voluntary despite evidence of some physical coercion. The situation described by Daniels, of agents entering her home with assault rifles, does not rise to the level necessary to invalidate her consent to search her apartment or her cellular phone. Accordingly, the court concludes that Daniels' consents to

search were voluntary and not the product of any force or coercion. *See generally United States v. Desir*, 257 F.3d 1233, 1236 (11th Cir. 2001).

### C.  Voluntariness of Statements

Finally, in her motion, Daniels contends that any statements she gave were in violation of *Miranda* because she was not read her rights, and she did not sign the *Miranda* waiver until after she had given incriminating statements.  Thus, the remaining issue before the court is whether Daniels was coerced into waiving her Fifth Amendment rights, or whether she knowingly and voluntarily waived those rights.  In *Miranda v. Arizona*, the Court held that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." 384 U.S. 436, 444 (1966).  The inquiry has two distinct dimensions.  First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran*, 475 U.S. at 421.

Daniels asserts in a conclusory manner that, based on the totality of the circumstances,

her waiver was coerced, and it was not knowing and voluntary. The court concludes that Daniels' waiver of her *Miranda* rights was not coerced. First, it is undisputed that Daniels was read her *Miranda* rights after Spivey explained to her that the police were there to execute a search warrant. It is further undisputed that Daniels signed the form indicating that she understood that she was waiving her rights after reading the form. She placed her initials beside each right she was waiving. It is undisputed that Spivey did not interview Daniels until after Daniels had been read, had read and signed the form waiving her *Miranda* rights.

Next, no evidence supports a conclusion that law enforcement officers coerced Daniels into giving a statement. Absent allegations of coercive police tactics to obtain a statement, a confession will not be deemed involuntary. *Connelly*, 479 U.S. at 167; *United States v. Scheigert*, 809 F.2d 1532, 1533 (11th Cir. 1987). A court looks to such factors as whether the defendant was subjected to "an exhaustingly long interrogation," whether the interrogators applied physical force to the defendant or threatened to do so, and whether the interrogators made promises to induce the defendant's statements. *United States v. Thompson*, 422 F.3d 1285, 1295-96 (11th Cir. 2005). Daniels does not allege that she was subjected to an interrogation of "exhaustingly long duration." *Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1988). The officers were at the house executing the search warrant for approximately three hours. There is no evidence that Daniels was interrogated that entire time. *See Berghuis v. Thompkins*, — U.S. —, —, 130 S.Ct. 2250, 2263 (2010) (finding that an interrogation three hours long is not inherently coercive.) Daniels does not allege, and no evidence suggests, that law enforcement officers applied physical force or threatened to do

14

so. Daniels does not allege that she was under any kind of restraint while at home,[11] or that the manner of the interrogation was coercive.

No evidence suggests that the officers engaged in any trickery or deceit to secure her waiver and subsequent statements. *See United States v. Brenton-Farley*, 607 F.3d 1294, 1299 (11th Cir. 2010) (the defendant "was not deceived about 'the nature of his rights and the consequences of abandoning them.'"); *United States v. Graham*, 323 Fed. Appx. 793, 801 (11th Cir. 2009) (the defendant's "incriminating statements were not the *product* of any deceptive comments" made by law enforcement officers) (emphasis in original).

Daniels suggests that the fact that she was interviewed after her apartment was entered by officers carrying assault rifles, and while her apartment was searched was somehow coercive. Daniels is simply wrong.

> We agree with the district court that the totality of the circumstances demonstrate that [the defendant's] statements to law enforcement officers were voluntary. Before Blackwell and Witrick proceeded with any questioning, [the defendant] affirmed that he was willing to speak with the agents, and the agents advised him of his rights and the nature of their investigation. Both an audio recording and a signed waiver form document that [the defendant] had been informed of his *Miranda* rights before he consented to be interviewed. *See id.* [The defendant] indicated on the waiver-of-rights form that he had obtained four years of college education. *See Hubbard,* 317 F.3d at 1253. While approximately eight law enforcement officers participated in the execution of the search warrant, some of whom had their guns drawn upon

---

[11] Daniels does not allege, and the facts do not support, that she was told that she was under arrest or that she was "in custody." Daniels' "status as a suspect, and the "coercive environment" that exists in virtually every interview by a police officer of a crime suspect, did not automatically create a custodial situation." *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000). Billings testified that Agent Spivey read Daniels' her *Miranda* warnings as soon as they began talking even though she was not, at that time, under arrest. While Daniels was asked to sit on the couch, and was not permitted to "roam around" the apartment, she was not physically restrained during Spivey's questioning.

> entry, neither Blackwell nor Witrick drew their guns during the interview, and no one stood guard over [the defendant.] Witrick and Blackwell interviewed [the defendant] at his kitchen table, while other law enforcement officers physically searched the home and conducted a forensic search of his computer. During the interview, [the defendant] was not handcuffed, and he did not at any point ask to stop the questioning, nor did he request an attorney. Further, there is no evidence that the agents made any promises or threats to induce his statements. *See id.* In sum, [the defendant's] post-*Miranda* statements were not involuntary in that they were not the product of "intimidation, coercion, or deception." *Barbour,* 70 F.3d at 585. Thus, the district court did not err in denying [the defendant's] motion to suppress his statements . . . .

*United States v. Vanbrackle,* 397 Fed. Appx. 557, 562-63 (11th Cir. 2010) (No. 09-15024). Based on the totality of the circumstances before the court, the court concludes that Daniels was not coerced into giving a statement, and that her waiver of her rights was knowing and voluntary.

## IV. Conclusion

For the reasons as stated, this court concludes that the defendant's constitutional rights were not violated, and it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion to suppress be DENIED. It is further

ORDERED that the parties shall file any objections to the said Recommendation on or before **December 26, 2012.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District

Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 12th day of December, 2012.

                                        /s/Charles S. Coody
                                  CHARLES S. COODY
                                  UNITED STATES MAGISTRATE JUDGE